FILED
CLERK

1/30/2023 2:50 pm

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
ROSARY BERTUZZI,

                            Plaintiff,

            -against-

COPIAGUE UNION FREE SCHOOL DISTRICT, BOARD
OF EDUCATION OF COPIAGUE UNION FREE SCHOOL
DISTRICT, DR. KATHLEEN BANNON, TODD ANDREWS
MICHELLE BUDION *Individually, and as Aiders and Abettors,*

                            Defendants.
------------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**
17-CV-4256 (JS) (ARL)

**LINDSAY, Magistrate Judge:**

Before the Court, on referral from District Judge Seybert, is the motion of the defendants, the Copiague Union Free School District (the "District"), the Board of Education of Copiague Union Free School District (the "Board"), Superintendent Kathleen Bannon ("Bannon"), Assistant Superintendent for Human Resources Todd Andrews ("Andrews") and the District Coordinator of Foreign Language Michelle Budion ("Budion") (collectively, the "defendants"), for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56. For the reasons set forth below, the Court respectfully recommends that the motion be granted, in part.

## BACKGROUND

### A.    Factual Background

The following facts are drawn from the parties' Local Rule 56.1 Statements and are uncontested unless otherwise noted.

### 1.    The Parties

The plaintiff, Rosary Bertuzzi ("Bertuzzi"), was a certified foreign language teacher employed by the District between September 1986 and June 2018. Defs.' Rule 56.1 Stmt. ¶¶ 1,

2; Defs.' Mem. at 1.  She retired on June 30, 2018.  Defs.' Rule 56.1 Stmt. ¶ 40.  Bannon has

been the Superintendent of Schools of the District since 2016.  *Id.* ¶ 3.  Andrews has been the

Assistant Superintendent of the District since 2013.  *Id.* ¶ 4.  From 2008 to 2013, Andrews was

the Executive Director of Human Resources for the District.  *Id.* ¶ 5.  Michelle Passeggiata née

Budion ("Budion") was the Coordinator of English Language Learning ("ELL") for the District

from 2009 to 2017 and was promoted to Director of English as a New Language ("ENL") and

World Languages in August 15, 2017.  *Id.* ¶¶ 6, 8; Pl.'s Rule 56.1 CounterStmt. ¶ 8.  Nonparty

Joseph Agosta ("Agosta") has been the Principal of Walter G. O'Connell Copiague High School

since September 2015.  Defs.' Rule 56.1 Stmt. ¶ 9.

### 2.      Bertuzzi's Alleged Disability

According to the amended complaint, in 1998, Bertuzzi was in a car accident that resulted

in several medical impairments, including chronic intractable neck pain from a cervical disc

disorder, degenerative disc disease and herniated discs.  Am. Compl. ¶ 18.  Bertuzzi claims her

disabilities are chronic and permanent medical impairments that affect and limit her major life

activities and prevent her from performing a variety of tasks centrally important to her life.  *Id.*

¶¶ 74-75.  Bertuzzi also alleges that her conditions are exacerbated by repeated, consistent, and

persistent activity, such as moving in "small spurts on a consistent basis." *Id.* ¶ 20.

Notwithstanding these allegations, Bertuzzi maintains that she was more than capable of

performing the essential functions of her position had she been permitted to teach and prepare

lessons in a single classroom.  *Id.* ¶ 21.  To this end, as early as 2015, Bertuzzi began submitting

letters from treating physicians indicating that her chronic and intractable neck pain would not

interfere with her ability to effectively perform her work and work related responsibilities.

Gilbert Decl. Ex. 1.  However, those physicians recommended a variety of accommodations to

enable her to do so, which depending on the year and the doctor, included (1) limiting lifting, carrying and bending; (2) limiting changes in classrooms throughout the day[1]; (3) limiting duties with respect to disruptive students with disciplinary issues and learning disabilities; and (4) limiting prolonged sitting or standing. *Id.;* Pl.'s Controverted Stmt. ¶ 2. The defendants claim that in 2017-18, one physician also recommended that Bertuzzi be assigned a classroom on the ground level for all teaching and preparation or a non-teaching position on ground level. Gilbert Decl. Ex. 1.

### 3. Bertuzzi's Room Assignments

Full-time high school teachers in the District have five teaching periods, two preparation periods, one duty period and one lunch period.[2] Defs.' Rule 56.1 Stmt. ¶ 44. The preparation periods are used by teachers for non-instructional work, such as to prepare for classes, do any kind of grading or planning, or to provide extra help. *Id.* ¶ 49. Teachers must remain in the building for their two preparation periods but may utilize any space to prepare that is empty and not utilized for that period for some other purpose. *Id.* ¶ 50. Duty period assignments include cafeteria duty, hall duty, attendance duty and study hall, and generally last for one semester or the entire school year. *Id.* ¶ 54. The placement of teachers in classrooms and the assignment of courses to be taught by them are determined as part of the high school's master schedule. *Id.* ¶ 78.

Prior to the 2013-14, 2014-15 and 2015-16 school years, Bertuzzi asked to be assigned to work and prepare in one classroom on the first floor. Am. Compl. ¶¶ 32-3. Although she says

---

[1] Bertuzzi asserts that when her schedule requires that she switch classrooms throughout the day, she has to transport her personal and teaching materials to each classroom like her plan book, laptop, keys, her electronic power strip, assignments that need to be graded and a projector. Pl.'s Controverted Fact ¶ 12. According to the record, she was given a cart to do so. *Id.* She was also afforded a file cabinet. Defs.' Rule 56.1 Stmt. ¶ 75.
[2] Bertuzzi admits that she left campus during certain lunch periods. Defs.' Rule 56.1 Stmt. ¶ 47. She also went to the second floor for lunch on rare occasions when she need to speak to a colleague. Pl.'s Rule 56.1 CounterStmt. ¶ 48.

her requests were initially denied, the District eventually agreed to most of those requests.  *Id.*

For example, for the 2015-16 school year, the defendants provided Bertuzzi with one room - Room 100 - for all her teaching periods as well as her duty period.  Defs.' Rule 56.1 Stmt. ¶ 59, 61.  However, Bertuzzi was unable to prepare in Room 100 that school year because a Spanish II class was being taught in the room during her prep period.  *Id.* ¶ 60.  Bertuzzi acknowledges that classrooms cannot be dedicated to teachers for prep periods when they are needed for an instructional period.  *Id.* ¶ 67.  Nevertheless, she contends that the District should have assigned her a schedule for the 2015-16 school year that allowed her to prepare in Room 100 for Period 2 as she had done for the previous twelve years.  Pl.'s Rule 56.1 CounterStmt. ¶ 60.

Bertuzzi also complains that during the 2016-17 and 2017-18 school years, she was not provided one room within which to teach and prepare.  Defs.' Mem. at 1.  During the 2016-17 school year, Bertuzzi's work schedule and room assignments were as follows:

a. Period 1 – Room 108 (Spanish I)
b. Period 2 – Attendance Duty
c. Period 2 – Room 100 (Spanish II)
d. Period 4 – Lunch
e. Period 5 – Room 100 (Spanish II)
f. Period 6 – Room 100 (Spanish II)
g. Period 7 – Room 100 (Spanish II)
h. Period 8 – Prep
i. Period 9 – Prep

Defs.' Rule 56.1 Stmt. ¶ 63.  It is undisputed that Room 100 was needed for a double period of ENL. Period 1 and 2, that year.[3]  *Id.* ¶ 87.  According to Bertuzzi, given this schedule, she would often utilize the LOTE ("Language other than English") departmental workroom for her preparation periods when the classrooms in which she was assigned to teach were occupied.  *Id.*

---

[3] It appears that Bertuzzi had suggested a way in which to move around the teachers that year so that she could stay in Room 108 but Agosta found the suggestions to be unfeasible.  Defs.' Rule 56.1 Stmt. ¶¶ 89-90.  Pl.'s Rule 56.1 CounterStmt. ¶¶ 89-90.

¶ 52.  The LOTE department room is directly across from Room 108.  *Id.* ¶ 76.  Although her attendance duty that year was served in the attendance office, Bertuzzi never sought an accommodation with respect to that duty period.  *Id.* ¶¶ 55-7.

In any case, it is important to note that during the 2016-17 school year, Bertuzzi only worked for six days due to what she alleges was an on-the-job injury suffered on the first day of school while attempting to perform her preparation duties in the LOTE department room rather than her own classroom (Room 100 or 108).  *Id.* ¶ 11; Pl.'s Rule 56.1 CounterStmt. ¶ 63; Pl.'s Rule 56.1 Controverted Stmt. ¶ 33.[4] Although Bertuzzi blames the injury on her need to switch classrooms, the record reflects that she tripped on a wire.  Pl.'s Rule 56.1 Controverted Stmt. ¶ 33.  Bertuzzi claims that she was cleared to return to work on April 11, 2017, but the defendants refused to provide her with an accommodation so she was forced to stay home and exhaust accrued sick leave.[5]  *Id.* ¶¶ 36-7.  The defendants contend that when Bertuzzi was cleared to return to work in April they could not assign her to one single classroom on the ground floor for all periods because they couldn't change classroom assignments in the middle of a school year.  Defs.' Rule 56.1 Counter to Controverted Stmt. ¶¶ 36-7.  Nor could they create a new non-teaching assignment for her for the remainder of the year.  *Id.*  They did, however, offer her a schedule that required her to teach only one class period out of five in a different but adjacent classroom.  *Id.*

For the 2017-18 school year, Bertuzzi's work schedule and room assignments were as follows:

    a.    Period 1 – Room 108 (Spanish I)

---

[4] Bertuzzi submitted a request for leave pursuant to the Family Medical Leave Act.  Rudnicki Decl. Ex. E; 104: 4-17.

[5] Bertuzzi also contends that the defendants improperly docked her for 120 days of sick leave because of they way in which they had accounted for her absence.  However, those days were retroactively reinstated.  Pl.'s Rule 56.1 Controverted Stmt. ¶¶ 76-83.

    b.      Period 2 – Room 102 (Spanish II)
    c.      Period 3 – Prep
    d.      Period 4 – Room 108 (Spanish II)
    e.      Period 5 – Lunch
    f.      Period 6 – Room 102 (Spanish II)
    g.      Period 7 – Study Hall
    h.      Period 8 – Room 102 (Spanish II)

Defs.' Rule 56.1 Stmt. ¶ 71.  Room 102 is around the corner from Room 108.  Pl.'s Rule 56.1 CounterStmt. ¶ 94.  During the 2017-18 school year, Bertuzzi worked 88.5 days of the 184 days in the school year.  Defs.' Rule 56.1 Stmt. ¶¶ 13, 71.

Overall, Bertuzzi was never assigned a classroom other than on the first floor.  *Id.* ¶¶ 72-4;  Pl.'s Rule 56.1 CounterStmt. ¶¶ 72-4.  The defendants contend that her first floor room assignment was the direct result of her requests and the recommendations of her treating physicians.  Defs.' Rule 56.1 Stmt. ¶ 73.  Bertuzzi contends that the only reason she was assigned a classroom on the ground floor was because the first floor is the location of the Foreign Language Department.  Pl.'s Rule 56.1 CounterStmt. ¶¶ 73.  She also calls attention to the fact that all classes utilized for foreign language are generally in the same hallway.  *Id.* ¶ 74.  Yet, despite acknowledging the proximity of the classrooms to which she was assigned, Bertuzzi still asserts that she was required to move more than most of the other foreign language teachers and her assignments did not help to reduce the frequency of times she was required to lift, carry, bend, push, or change classrooms.. *Id.;* Pl.'s Rule 56.1 Controverted Stmt. ¶¶ 3, 20.

    **4.**     **Class Composition**

According to Agosta, "class make-up," meaning which students are assigned to which teachers, is generated by eSchool.  Agosta Aff. ¶ 3.  eSchool is a computer system that uses algorithms based on information inputted into the system like teacher recommendations, the number of courses being run as determined by department chairs and the courses students have

selected with their guidance counselors. *Id.* Students are assigned to their particular teachers by eSchool, not by any administrator or staff member. *Id.* ¶ 4. Changes can be made to a student's schedule after the start of the school year, but those changes are generally within the purview of the student, the student's family, the guidance department and the Committee on Special Education ("CSE"), where applicable. *Id.*

ENL and special education classes are given priority on the master schedule generated by eSchool. *Id.* ¶ 6. This is because ENL and special education students have the greatest number of constraints on their schedule due to the state requirements in place for both categories of students. *Id.* In fact, according to Agosta, 70% of the District's student body speaks a language other than English. *Id.* ¶ 8. In addition, many of those high school students participate in technical or other programs in the mornings or afternoons. *Id.* As a result, the master schedule always provides for a double period of ENL the first two and the last two periods of the day. *Id.* ¶¶ 7-8.

Moreover, students in the District are generally required to take one foreign language class to graduate.[6] Defs.' Rule 56.1 Stmt. ¶ 16. The foreign language department does not have a separate special education section. *Id*. ¶ 28. As a result, Level I classes in any language have a proportionately larger concentration of special education students. *Id*. ¶ 25. In any case, the process of creating the class roster begins in October preceding the school year and is overseen by the principle. Pl.'s Rule 56.1 Controverted Stmt. ¶ 7. Ultimately class rosters are determined by a combination of teachers, administrators and the computer scheduling system. *Id*. ¶ 8. After

---

[6] In some instances, student with disabilities are deemed exempt from foreign language requirements by the Committee on Special Education ("CSE") and, instead, can satisfy their language requirement in middle school. Id. ¶ 18

the master schedule is created, a room organization chart is then prepared to identify how each classroom would be utilized each period of the school day.  *Id.* ¶ 5.

### 5.    Bertuzzi's Class Ratios

As noted above, Bertuzzi submitted a number of letters from treating physicians indicating that being assigned "an inordinate [number] of students who have learning or disciplinary issues" would exacerbate her disabilities and could lead to further injury.  Gilbert Decl. Ex. 1.  It is clear from those letters that beginning in or around 2014, Bertuzzi began reporting to her physicians that her class rosters included a disproportionately high number of learning disabled, delinquent, and/or remedial students.  *Id.*; Bertuzzi Aff. at ¶ 162.

According to the District's LOTE Class Rosters, in 2014-15, Bertuzzi taught an Italian I class with a 13:4 ratio (31% classified students).  Defs.' Rule 56.1 Stmt. ¶ 36 [7]  That same year, two of her colleagues taught Spanish I classes with a 27:11 ratio (41% classified students) and a 22:8 ratio (36% classified students).  *Id.*  In 2015-16, Bertuzzi was assigned a Spanish I class with an 18:7 ratio (39% classified students), reflecting an increase from the prior year of 8% classified students.  *Id.* ¶ 37.  However, that same year, at least one colleague was assigned a Spanish I class with a 27:15 ratio (55.5% classified students).  *Id.*

---

[7] Bertuzzi contends that the rosters are not accurate.  Pl.'s Rule 56.1 CounterStmt.¶¶ 31-9.  Specifically, Bertuzzi contends that the defendants records underreported the number of classified students to which she was assigned. Pl.'s Rule 56.1 Controverted Stmt. ¶¶ 94, 96.  For example, she claims that during the 2017-18 school year she had 32 not 27 classified students in her class.  *Id.* ¶ 94.  Counsel for Bertuzzi also attests that the defendants originally produced the LOTE class rosters on or about February 16, 2021, in response to plaintiff's demand for documents. Gilbert Decl. ¶ 22.  However, upon a review of the responsive materials, he discovered that several of the records contradicted one another and he advised counsel for defendant of the inaccuracies. *Id.* . ¶ 24. As a result, on or about July 8, 2021, the defendants produced entirely new LOTE class rosters. *Id.*  § 25.  Counsel maintains that there are still "significant discrepancies" and changes between the 2017-18 LOTE rosters produced by defendants in February and July.  *Id.*  However, in her affidavit, Bertuzzi cites to the same statements in support of her claim that the number of special needs students she was assigned gradually increased each year between 2010 and 2018.  Bertuzzi Aff. ¶ 172.  Accordingly, the Court finds that the documents are sufficient to provide examples of the class ratios.

Similarly, in 2016-17, Bertuzzi was assigned at least one Spanish II class with a 19:6 ratio (31.5%). *Id.* ¶ 38. Although the percentage of classified student in that class was higher than the Spanish II classes taught by her colleagues, the percentage of classified students was lower than the Spanish I class she had taught the year before. *Id.* In 2017-18, Bertuzzi was then assigned a Spanish I class with a 25:10 ratio (40%). *Id.* ¶ 39. While the Spanish II classes taught by her colleagues that year had fewer classified students, Bertuzzi was the only teacher teaching a section of Spanish I that year. *Id.* n. 3.

### 6.    Bertuzzi's Observations and Meetings with Administration

Tenured teachers are subject to an Annual Professional Performance Review ("APPR"), which dictates teachers be observed and evaluated and rated in various domains as "highly effective," "effective," "developing," or "ineffective." Defs.' Rule 56.1 Stmt. ¶ 99. Final annual APPR ratings are listed as either "satisfactory" or "unsatisfactory." *Id.* The APPR sets the minimum number of announced and unannounced observations; it does not set a maximum number. *Id.* ¶ 100. Generally, additional observations of teachers are added when a teacher receives certain "developing" or "ineffective" ratings on an observation. *Id.* ¶ 106. It is within the District's rights to have two administrators present for any observation of a teacher, a concept known as "inter-rater reliability," while only one administrator may write up the evaluation. *Id.* ¶ 103.

Bertuzzi did not receive any "unsatisfactory" final APPR ratings for the 2015-16, 2016-17, or 2017-18 school years. *Id.* ¶ 105. However, prior to 2015, Bertuzzi had "sporadically" been admonished for her poor classroom management, was instructed to consult with special education teachers to enhance her understanding of how handicapping conditions impact teaching and learning, and was asked to reflect on her classroom disciplinary practices in order to

limit the number of students who are sent from her class to an assistant principal for minor infractions. *Id.* ¶ 107; Pl.'s Rule 56.1 CounterStmt.¶ 107.

Aside from her observations, Bertuzzi had several meetings with administration, including a number of meetings with Agosta, Assistant Principal Brad Reminick and the plaintiff's Union Representative, Darwin Ryan, which she recorded. Defs.' Rule 56.1 Stmt. ¶ 101. The defendants contend that during at least one of those meetings, they discussed the precise nature of the location in the master schedule of her Spanish I class. *Id.* ¶ 109. Bertuzzi notes that the purpose of that meeting was supposed be about her harassment complaints. Pl.'s Rule 56.1 CounterStmt.¶ 109. She says that instead of discussing her complaints, Agosta spent most of the meeting complaining about Bertuzzi's classroom management. *Id.* To this end, it appears Bertuzzi was calling security to her classroom on a daily basis. Defs.' Rule 56.1 Stmt. ¶ 110. As a counter, Bertuzzi states she should never have been assigned a Spanish I class given the large concentration of learning disabled students. Pl.'s Rule 56.1 CounterStmt. ¶ 109.

Bertuzzi also recorded a follow-up meeting during which Agosta again addressed her classroom management skills and interaction with special education students. Defs.' Rule 56.1 Stmt. ¶ 111. Bertuzzi claims Agosta should have been focusing on the volume and make-up of her class rather than her inability to manage the classroom. Pl.'s Rule 56.1 CounterStmt. ¶ 111. In sum, Bertuzzi points to these interactions as evidence of the breakdown in the interactive process that should have taken place with respect to her request for a reasonable accommodation. Pl.'s Rule 56.1 Controverted Stmt. ¶¶ 25-30. The defendants dispute this contention and claim it is Bertuzzi who refused to engage in the process. Defs.' Rule 56.1 Counter to Controverted Stmt. ¶¶ 25-30.

### B.    Procedural History

On November 17, 2016, Bertuzzi concurrently filed a charge of discrimination with the

New York State Division of Human Rights ("NYSDHR") and the Equal Employment

Opportunity Commission ("EEOC").  Am. Compl. ¶ 13.  The EEOC granted Bertuzzi's request

to administratively dismiss her charges on June 15, 2017 so that she could pursue litigation.  *Id.*

n. 1.  The agency then issued Bertuzzi a right-to-sue letter.  *Id.* ¶ 14.  On July 18, 2017, Bertuzzi

commenced this action claiming violations of her constitutional, statutory and common law

rights, including employment discrimination.  ECF No. 1.  On December 27, 2017, the

defendants filed a fully briefed motion to dismiss the complaint with the Court.  Almost four

months later, with the motion to dismiss still pending before the Court, Bertuzzi sought leave to

file an amended complaint.  ECF Nos. 20-1.  On August 9, 2018, Magistrate Judge Tomlinson

held a conference with the parties during which they agreed to enter into a stipulation deeming

the motion to dismiss moot and permitting the filing of the proposed amended complaint.  ECF

No. 24.  Accordingly, on August 16, 2018, Bertuzzi filed an amended complaint.  ECF No. 26.

On October 29, 2018, the defendants filed a fully briefed motion to dismiss the amended

complaint. ECF Nos. 30-7.  The following day, District Judge Feuerstein referred the defendants'

motion to Magistrate Judge Tomlinson for a report and recommendation.  On March 9, 2020,

Magistrate Judge Tomlinson issued her report, recommending dismissal of, among other things,

Bertuzzi's hostile work environment and constructive discharge claims.  ECF No. 38.

Specifically, she found:

> Here, Plaintiff contends that Defendants' various unlawful acts – including
> repeatedly ignoring Plaintiff's doctors' statements, observing and evaluating
> Plaintiff more frequently than other non-disabled teachers, assigning Plaintiff a
> disproportionate number of remedial and special needs students, and otherwise
> harassing and bullying Plaintiff -- rendered her workplace increasingly
> intolerable and hostile to such an extent as to alter the terms and conditions of

her employment. *See* Pl.'s' Opp'n at 20-21. The factual allegations concerning Plaintiff's hostile work environment claim state that: (1) "[e]ach year that the district granted plaintiff's request for reasonable accommodation, defendants would invariably harass [her] . . . so as to render her . . . work environment increasingly hostile in an effort to constructively discharge her," [Am. Compl.] ¶ 34; and (2) the District's "deviation from [its] policy regarding evaluations . . . was done purposefully . . . [to] create a hostile workplace," *id.* ¶ 53. In addition, Plaintiff claims generally that Defendants' "continuous and ongoing unlawful discrimination, retaliation and pervasive harassment," *id.* ¶¶ 164-66, rendered her workplace hostile, including being reprimanded in front of her class, *id.* ¶¶ 131-34, and dismissed from a teachers' conference, *id.* ¶¶ 98-100.

Practically speaking, Plaintiff contends that the conditions of her employment were altered for the following reasons: (1) the District annually denied her requested reasonable accommodation in the first, acquiescing only after the submission of medical documentation and the threat of legal action, *id.* ¶¶ 28-29; (2) the District altogether denied her requested reasonable accommodation beginning in the 2016-2017 school year, *id.* ¶¶ 39-40, 57-58, 116, 121; (3) the District deviated from its teacher evaluation/observation policy and evaluated/observed Plaintiff four times, instead of two times, rating Plaintiff ineffective on one occasion, *id.* ¶¶ 41-49; (4) Plaintiff was assigned a disproportionate number of special needs students, increasing Plaintiff's workload, *id.* ¶ 36; (5) Plaintiff was assigned a teaching schedule that required excessive movement throughout the day, *id.* ¶¶ 59-60; 109-10; and (6) Plaintiff was otherwise bullied and harassed, including being told that she should not have appeared at a teachers' conference in May 2016 and being reprimanded in October 2017 in front of her class, *id.* ¶¶129-34.

Although Plaintiff's complaints may be sufficient to make out claims for discrimination and retaliation, the factual allegations do not sufficiently allege conduct which is so objectively severe or pervasive as to alter the conditions of Plaintiff's employment.

*         *         *

Here, Plaintiff alleges episodic acts which were not physically threatening or sufficiently severe or pervasive. Indeed, Plaintiff's chief complaints – that she was denied a reasonable accommodation, assigned a disproportionate number of special needs students, and evaluated more than other non-disabled teachers – are not sufficient to plead a hostile work environment, especially since Plaintiff does not dispute that Defendants either granted Plaintiff's requested reasonable accommodation or offered an alternative accommodation. Further, Plaintiff concedes that she was evaluated only two times more than nondisabled teachers, and her sole ineffective rating was ultimately expunged. Am. Compl. ¶¶ 22, 47, 51, 68; *see also* Pl.'s Mem.

ECF No. 38.

Bertuzzi objected to the report, arguing that Magistrate Judge Tomlinson had erred in recommending dismissal of the hostile work environment claim. ECF No. 45. Notwithstanding her objections, District Judge Feuerstein found no clear error and adopted the recommendation noting that Bertuzzi's objections were simply restatements of the arguments raised in her opposition papers. ECF No. 48. Notably, in doing so, the Court overruled Bertuzzi's objections to the extent she argued that the failure to accommodate her disability led her to experience fear of physical harm while she performed her work. *Id.* As a result, Bertuzzi's remaining claims are discrimination, retaliation, and failure to accommodate as it pertains to both the NYSHRL and ADA.[8]

On July 30, 2020, the defendants filed their answer to the remaining claims in the amended complaint and, between July 2020 and July 2021, the parties conducted discovery pursuant to a number of scheduling orders issued by the Court. *See* ECF Nos. 51, 59. Notably, the September 2020 scheduling order included a deadline to seek leave to amend the pleadings or join additional parties. ECF No. 59. On the day before that deadline was set to expire, Bertuzzi requested, and was granted, an extension to January 18, 2021 to file her motion to amend. See ECF No. 57. However, Bertuzzi waited until July 22, 2021 to file the motion. ECF No. 84. Her July motion was immediately rejected by the Court.

On August 17, 2021, Bertuzzi filed an amended motion, seeking to reassert her claim for a hostile work environment and constructive discharge. ECF No. 90. That motion was referred to the undersigned. In January 11, 2022, the undersigned recommended that the motion be

---

[8] The Court further determined that for purposes of the ADA, all claims prior to January 22, 2016 are time-barred. In addition, the Court ruled that all claims prior to July 18, 2016, brought under the NYSHRL, are similarly time-barred.

denied finding that Bertuzzi had failed to establish good cause for filing the untimely motion. ECF No. 94.  The Court also reported that although Bertuzzi had attempted to provide the Court with documentary evidence to bolster her claims, her proposed hostile work environment and constructive discharge claims were simply a repackaging of claims that were dismissed in 2020. *Id.*

On May 11, 2022, the defendants filed the instant motion for summary judgment.  The motion was referred to the undersigned on October 31, 2022.

## DISCUSSION

### A.    Standards of Law

"'Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law.'"  *Puglisi v. Town of Hempstead*, No. 10 CV 1928, 2012 WL 4172010, *6 (E.D.N.Y. Sept. 17, 2012) (quoting *In re Blackwood Assocs., L.L.P.,* 153 F.3d 61, 67 (2d Cir. 1998) and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c)).  In deciding a summary judgment motion, the district court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the opposing party.  *See Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc*., 150 F.3d 132, 137 (2d Cir. 1998).  If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable.  *See Holt v. KMI-Continental, Inc*., 95 F.3d 123, 129 (2d Cir. 1996), *cert denied*, 520 U.S. 1228 (1997).

The trial court's responsibility is "limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."  *Gallo v. Prudential Residential Servs.,*

14

*L.P.,* 22 F.3d 1219, 1224 (2d Cir. 1994). When, however, there is nothing more than a "metaphysical doubt as to the material facts," summary judgment is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[T]here must exist 'specific facts showing that there is a genuine issue for trial' in order to deny summary judgment as to a particular claim." *Jamaica Ash & Rubbish v. Ferguson*, 85 F. Supp. 2d 174, 180 (E.D.N.Y. demonstrating that little or no evidence may be found in support of the non-moving party's case. Accordingly, "[w]hen no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Marks v. New York Univ.*, 61 F. Supp. 2d 81, 88 (S.D.N.Y. 1999).

**B.      Local 56.1 Statements**

Local Rule 56.1(b) requires a party opposing a motion for summary judgment to submit a statement responding to each numbered paragraph in the movant's statement of facts, and if necessary, submitting additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried (the "Counterstatement"). *See* Local Rule 56.1(b). Although Bertuzzi has submitted a Counterstatement (Controverted Facts) setting forth the issues that she claims are in dispute, neither her Counterstatement nor her Controverted Facts comply with the Local Rule. In many instances, Bertuzzi's responses contain lengthy factual arguments that go well beyond the statement to which she was intended to respond. In addition, Bertuzzi's "Controverted Facts" recite many of the same arguments contained in her Counterstatement. Nonetheless, mindful of the fact that "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules" see *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir.

2001), the undersigned has not stricken those statements as requested by the defendants and, instead, has undertaken a comprehensive, independent review of the record and included only relevant facts.

### C.    Notice of Claim – Condition Precedent

As a threshold matter, the defendants seek to dismiss Bertuzzi's discrimination and retaliation claims brought under the New York State Human Rights Law ("NYSHRL") because she failed to file a formal notice of claim with the District.  New York Education Law section 3813 provides in relevant part:

> No action or special proceeding, for any cause whatever . . . shall be prosecuted or maintained against any school district . . . or any officer of a school district . . . unless it shall appear by and as an allegation in the complaint . . . that a written verified claim upon which such action or special proceeding is founded was presented to the governing body of said district or school within three months after the accrual of such claim.

N.Y. Educ. Law § 3813(1).  Pursuant to this provision, "[t]he plaintiff[s] must allow thirty days to elapse after the notice is filed before filing a complaint, and show that in that time period the defendant[s have] either neglected or refused to satisfy the claim." *Peterson v. New York City Dep't of Educ.,* No. 18-CV-1515 (ILG), 2020 WL 2559835, at *11 (E.D.N.Y. May 20, 2020) (citing N.Y. Educ. Law §§ 3813(1), (2)). "These requirements are 'construed strictly,' and so 'failure to abide by their terms mandates dismissal of the action.'" *Id.* (citing *Smith v. New York City Dep't of Educ.,* 808 F. Supp. 2d 569, 578 (S.D.N.Y. 2011)).

Although it is undisputed that Bertuzzi failed to file a formal notice of claim, such as a claim pursuant to N.Y. Gen. Mun. Law § 50-e ("GML"), the District defendants' argument is without merit.  Magistrate Judge Tomlinson indicated in her report and recommendation that courts are split on the type of notice required under § 3813(1).  *See Bertuzzi v. Copiague Union Free Sch. Dist.*, No. CV 17 4256 SJF AKT, 2020 WL 5899949, at *19 (E.D.N.Y. Mar. 9, 2020),

report and recommendation adopted as modified, No. 17 CV 4256 SJF AKT, 2020 WL 3989493 (E.D.N.Y. July 15, 2020)(citing *Berrie v. Bd. of Educ. of Port Chester-Rye Union Free Sch. Dist.*, No. 14-CV-6416 (CS), 2017 WL 2374363, at *8 (S.D.N.Y. May 31, 2017), aff'd, 750 Fed. App'x 41 (2d Cir. 2018) (the Second Circuit is currently undecided as to whether NYSHRL claims against a school district require a notice of claim)).  § 3813(2) – which concerns actions founded upon tort – clearly requires that a notice of claim be served in compliance with GML § 50-e.  N.Y. Educ. Law § 3813(2) (McKinney)).  In contrast, "the plain language of Section 3813(1), . . . does not . . . require a formal notice of claim or refer to GML § 50-e, but only states that the claims must have been 'presented to the . . . district or school within three months after the accrual of such claim' prior to filing a complaint." *See Berrie,* 2017 WL 2374363, at *8.  In this case, Bertuzzi substantially complied with § 3813 by sending a detailed letter to the District on September 16, 2016, in which she set forth the underlying factual basis for her state law discrimination claims.  *See Bertuzzi,* 2020 WL 5899949, at *20.  Therefore, the undersigned finds that Bertuzzi is not barred from asserting claims under the NYSHRL.

### D.    Bertuzzi's ADA and NYSHRL Failure to Accommodate Claims

The American with Disabilities Act ("ADA") was enacted by Congress to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).  Discrimination claims under the ADA may be based on "three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." *Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 573 (2d Cir. 2003) (superseded by regulation on other grounds). With respect to the third theory, employers must make "reasonable accommodations" for qualified individuals with a disability, unless the employer can show that such an

accommodation would impose an "undue hardship." 42 U.S.C. § 12112(b)(5)(A).

"[R]easonable accommodation[s]" may involve:

> A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
>
> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

*Hernandez v. Int'l Shoppes, LLC*, 100 F. Supp. 3d 232, 251 (E.D.N.Y. 2015) (citing 42 U.S.C. § 12111(9)). "'Undue hardship' is defined as: '[a]n action requiring significant difficulty or expense. . ..'" *Id.* (citing 42 U.S.C. § 12111(10)(A)).  The factors considered when determining whether "a reasonable accommodation would put an undue hardship on a business include:

> (i) the nature and cost of the accommodation needed under this chapter;
>
> (ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;
>
> (iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and
>
> (iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity."

*Id.* (citing 42 U.S.C. § 12111(10)(B)).

While disability discrimination claims under the ADA and the NYSHR are analyzed similarly, it warrants mention that the definition of disability is broader under the NYSHRL. *Levine v. Smithtown Cent. Sch. Dist.*, 565 F. Supp. 2d 407, 428 (E.D.N.Y. 2008).[9] Nevertheless,

---

[9] Disability is defined as (a) a physical, mental or medical impairment resulting from anatomical, physiological,

under the NYSHRL employers are also required to reasonably accommodate disabled employees unless such an accommodation would impose an "undue hardship" on the business. *Id.* (citing N.Y. Exec. Law § 296(3)(a)-(b)).  Under the NYSHRL, reasonable accommodation is defined as:

> [A]ctions taken which permit an employee . . . with a disability to perform in a reasonable manner the activities involved in the job or occupation sought or held and include, but are not limited to, provision of an accessible worksite, acquisition or modification of equipment, support services for persons with impaired hearing or vision, job restructuring and modified work schedules; provided, however, that such actions do not impose an undue hardship on the business . . . from which action is requested.

*Id.* (citing N.Y. Exec. Law § 292(21–e)). "'[U]ndue hardship' is defined as a 'significant difficulty or expense to the employer.'" *Id.* (citing 9 N.Y.C.R.R. § 466.11(b)(2)).

Claims brought under the ADA and NYSHRL for failure to accommodate are analyzed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *See Berger v. New York City Police Dep't,* 304 F. Supp. 3d 360, 367 (S.D.N.Y. 2018). "To maintain a *prima facie* claim under the ADA or the NYSHRL for failure to accommodate, an employee must show that: '(1) [she] is a person with a disability under the meaning of the ADA [or the NYSHRL]; (2) an employer covered by the statute had notice of [her] disability; (3) with reasonable accommodation, the employee could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.'" *Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 94 (2d Cir. 2015)).  If a plaintiff is able to satisfy the burden of "production and persuasion as to the existence of an accommodation that is facially reasonable," the burden "shifts to the defendant[s] to rebut the reasonableness of the proposed

---

genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques; or (b) a record of such an impairment; or (c) a condition regarded by others as such an impairment, provided, however, that in all provisions of this article dealing with employment, the term shall be limited to disabilities which, upon the provision of reasonable accommodations, do not prevent the complainant from performing in a reasonable manner the activities involved in the job or occupation sought or held.  *Hernandez,* 100 F. Supp. 3d at 251 (citing N.Y. Exec. Law § 292 (21)).

accommodation," which "is in essence equivalent to the burden of showing, as an affirmative defense, that the proposed accommodation would cause the defendant[s] to suffer an undue hardship.'" *Berger,* 304 F. Supp. 3d at 369 (citing *Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 76 (2d Cir. 2016)). "Although '[t]he reasonableness of an employer's accommodation is a 'fact-specific' question that often must be resolved by a factfinder,' where an 'employer has already taken (or offered) measures to accommodate the disability, the employer is entitled to summary judgment if, on the undisputed record, the existing accommodation is 'plainly reasonable.'" *Id.* (citing *Noll*, 787 F.3d at 94). Accordingly, "[i]f the proposed accommodation is 'plainly reasonable,' '[t]here is no need to engage in further burden-shifting to consider whether the employee's requested accommodation would have been reasonable.'" *Id.*

In this case, Bertuzzi argues that the defendants failed to provide her with a reasonable accommodation, willfully failed to engage in an interactive process and subjected her to disparate treatment designed to inflict extreme pain and duress, penalize her financially and leave her no choice but to retire.[10] Pl.'s Mem. at 3. Specifically, Bertuzzi maintains that beginning in 2015, the defendants refused to provide her with a single classroom for all of her teaching and preparation periods, despite having been able to do so for the prior twelve years. *Id.* 5-6. Although she acknowledges that the defendants did assign her to classrooms that were in close proximity to each other, and she admits that she never sought an accommodation with respect to her duty periods, Bertuzzi nonetheless claims that the purported accommodations provided to her between 2015 and 2018 were inadequate. *Id.* The undersigned disagrees.

The summary judgment record clearly establishes that the accommodations she was provided were plainly reasonable for the 2015-16 and 2016-17 school years given the

---

[10] As noted above, Bertuzzi does not have a constructive discharge claim.

pedagogical concerns of the District.  During the 2015-16 school year, Bertuzzi was assigned one room - Room 100 - for all her teaching periods as well as her duty period.  Defs.' Rule 56.1 Stmt. ¶ 59, 61.  Although the defendants were unable to assign her to Room 100 for her preparation period that year, it is clear that Room 100 was needed for a Spanish II class.  *Id.* ¶ 60.  To this end, Bertuzzi has acknowledged classrooms cannot be dedicated to teachers for prep periods when they are needed for an instructional period.  *Id.* ¶ 67.

The reasonableness of the 2015-16 accommodation is further bolstered by the fact that Bertuzzi's disability did not completely prevent her from moving around.  Bertuzzi routinely walked greater distances than between two adjacent classrooms such as when she would enter the school in the morning from the parking lot outside the wing where the language classrooms were located, then walk to the LOTE workroom near Room 108 to put her things down and then walk to the main office to sign in.  Defs.' Rule 56.1 Stmt. ¶ 58.  Indeed, despite her claim that short, repetitive movements exacerbated her condition, she was willing to take duty periods in other locations in the building such as the attendance office (which she says she did for the good of the school) and occasionally opted to leave the building for lunch or to join a colleague for lunch on the second floor.  *Id.* ¶¶ 47-48, 55-57; *see also* Bertuzzi Aff. ¶ 12.  In other words, Bertuzzi cherry-picked when to impose her physicians' recommendations to limit her activity.

During the 2016-17 school year, the defendants continued to assign Bertuzzi to Room 100 for four of her five teaching periods.  However, they were unable to assign her to Room 100 during period 1 because Room 100 was needed for a double period of ENL.  *Id.* ¶ 87.  To account for the fact that Bertuzzi had to occasionally move around, she was provided with a cart to transport her personal and teaching materials to each classroom, was afforded a file cabinet to store material, and was offered an extra set of textbooks to store in each classroom and assistance

21

packing up material which the defendants say she refused. Pl.'s Controverted Fact ¶ 12; Defs.' Rule 56.1 Stmt. ¶ 75; Defs.' Mem. at 4. In addition, Bertuzzi's suggestion that her accident on the first day of the 2016 school year evinces the ineffectiveness of the proposed accommodation is simply unfair. The record is clear that Bertuzzi was injured tripping over a wire not because her underlying condition was exacerbated by the alleged increase in "moving, lifting, carrying, and/or pushing."

Moreover, it is important to note that the impact of the 2016-17 accommodation is very limited since Bertuzzi only worked for six days during that school year. In fact, she left at the beginning of the school year and was not cleared to return to work until April 11, 2017. The defendants contend that by the time Bertuzzi was cleared to return to work in April, it would have been far too burdensome to alter the class assignments in the middle of school year to accommodate her request to work in a single classroom. Defs.' Rule 56.1 Counter to Controverted Stmt. ¶¶ 36-8. Nor could they create a new non-teaching assignment for her for the remainder of the year. *Id.* Finally, although Bertuzzi argues that even minimal movement during the school day was more than what her treating physicians recommended, the defendants were "not required to provide a perfect accommodation or the very accommodation most strongly preferred by the employee." *Noll,* 787 F.3d at 95; *see also Goonan v. Fed. Reserve Bank of N.Y.*, 916 F.Supp.2d 470, 479 (S.D.N.Y. 2013).

There is, however, a genuine factual dispute about whether the proposed accommodation for the 2017-18 school year posed an "undue hardship" to defendants. There is no question that Bertuzzi's schedule during her final year of teaching required the most movement. Specifically, Bertuzzi's room assignments were equally split between Room 102 and 108 requiring her to switch locations all nine periods. Defs.' Rule 56.1 Stmt. ¶ 71. Although the defendants note that

22

Room 102 and 108 are adjacent classrooms on the first floor, *see id.* ¶ 71, they have not offered any evidence to explain why it would have been burdensome to provide Bertuzzi with a single classroom that year. *See Einsohn v. New York City Dep't of Educ.,* No. 19 CV 2660 RPK RER, 2022 WL 955110, at *5 (E.D.N.Y. Mar. 30, 2022) (denying summary judgment where defendants failed to make a detailed showing as to why student safety required every assistant principal to participate in hall duty or to offer concrete evidence indicating the likely impact of the plaintiff's accommodation on school operations).

Nevertheless, the defendants urge the Court to consider the fact that Bertuzzi is still barred from recovering on any of her failure to accommodate claims because she caused a breakdown in the interactive process. Ironically, Bertuzzi fires the same argument back at the defendants. "'The ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated.'" *Jeffries v. Verizon,* No. CV 10-2686 JFB AKT, 2012 WL 4344197, at *16 (E.D.N.Y. Aug. 31, 2012), report and recommendation adopted, No. 10-CV-2686 JFB AKT, 2012 WL 4344188 (E.D.N.Y. Sept. 21, 2012) (citing *Jackson v. N.Y. State Dep't of Labor*, 205 3d. 562, 566 (2d Cir. 2000) ). Indeed, "[a]t least one court in this Circuit has adopted the view that if an employee withdraws from the interactive process, that employee is precluded from later alleging that the employer failed to accommodate him." *Id*. (citing *Noel v. BNY–Mellon Corp.*, No. 10 Civ. 9143, 2011 WL 4633884, at *2 (S.D.N.Y. Oct. 4, 2011) ).

Relying on this principle, the defendants argue that summary judgment should be granted in their favor because Bertuzzi unreasonably cut off the interactive process – demanding to teach and prepare in a single classroom and merely reiterating the exact demand over and over again. As an initial matter, the Court notes that both parties have provided only scant evidence as to

discussions which took place regarding Bertuzzi's schedule. The Court also notes that the tape conversation concerning the 2017-18 schedule, for example, could be viewed by a reasonable jury as a breakdown in communication on the part of both parties. In that instance, the defendants claim that the meetings were scheduled to discuss the precise nature of the placement in the master schedule of Bertuzzi's Spanish I class given the fact that she was the only teacher teaching the only section of Spanish I that year. Defs.' Rule 56.1 Stmt. ¶ 109. Bertuzzi argues, in contrast, that during a vast majority of the meetings, the defendants wanted to address allegations concerning her classroom management not her request for an accommodation. Pl.'s Rule 56.1 CounterStmt. ¶ 109. In fact, it is clear that by 2017, Agosta was concerned that Bertuzzi was calling security to her classroom on a daily basis, sending students to ISS, and having difficulty managing special education students in her class. Defs.' Rule 56.1 Stmt. ¶ 110. As such, the determination as to who withdrew from the interactive process in 2017 is a determination to be made by the jury. Accordingly, for all of the reasons outlined above, the undersigned recommends granting summary judgment on Bertuzzi's failure to accommodate claims with respect to the 2015-16 and 2016-17 school years and denying summary judgment with respect to the 2017-18 school year.[11]

### E.    Bertuzzi's Disparate Treatment and Retaliation Claims

Bertuzzi also asserts that the defendants subjected her to disparate treatment and retaliatory conduct because of her disability. Pl.'s Rule 56.1 Controverted Stmt. ¶ 76. Specifically, Bertuzzi claims that due to her disability, the defendants actively worked to assign

---

[11] It should be noted that the Court finds the defendants aiding and abetting argument to be without merit. The argument is based entirely on a finding of liability with respect to the District. *See, e.g. Conklin v. County of Suffolk,* 859 F.Supp.2d 415, 436 (E.D.N.Y. May 3, 2012) ("as the employee's liability necessarily hinges on that of the employer, the employer must be held liable for an individual to also be held liable under this provision."). Given the Court's determination that failure to accommodate claims should go forward with respect to the 2017-18 school year, the defendants' argument is not ripe. To the extent the Court has determined that the claims should be dismissed in their entirety, the argument is moot.

her rooms that exacerbated her disabilities, intentionally caused her to exhaust her sick leave and purposely assigned her a disproportionate number of disciplinary and special needs kids. *Id.* ¶¶ 79-118. Because Bertuzzi has comingled her arguments with respect to her disparate treatment and retaliation claims, the Court will address those claims in tandem.

"The disparate treatment theory is a method of establishing a *prima facie* case of [disability] discrimination [but] the burden of establishing a persuasive comparison lies with the [p]laintiff." *Tillman v. Verizon New York, Inc.,* 118 F. Supp. 3d 515, 536 (E.D.N.Y. 2015). In this case, Bertuzzi has not met that burden. To begin with, there is no evidence to support a finding that Bertuzzi was given less favorable classroom assignments that her non-disable coworkers. Indeed, Bertuzzi only points to one other language teacher who was assigned a single classroom for all teaching and preparation periods during the 2016-17 school year. Bertuzzi Aff. ¶ 29. However, little can be gleaned from the master schedule on which she relies. Other than pointing to the schedule of her colleague, Bertuzzi has offered no analysis of the classes that her colleague was teaching that year, the number and make-up of the students assigned to her colleagues classes or the other language classes that had to be offered during the same periods.[12] In the same vein, little can be concluded from the fact that 20 of the approximately 200 teachers at the school were also assigned to a single classroom at some point during the relevant time period. *Id.* ¶ 137. Without more, the fact that on occasion teachers were assigned single classrooms is not persuasive evidence of disparate treatment.

Similarly, Bertuzzi has failed to establish a *prima facie* case of disparate treatment with respect to the District's accounting of her sick leave. The record before the Court illustrates that despite being cleared to return to work on April 11, 2017, Bertuzzi remained at home and began

---

[12] Notably, that particular colleague was not assigned to a single classroom in 2015-16. Gilbert Decl. Ex. 2.

exhausting her accrued sick leave.  *Id.* ¶¶ 64-75.  Bertuzzi contends that she was forced to do so because the defendants refused her accommodation.  At any rate, it appears that rather than coding her absences as workers' compensation, the defendants began coding her absences as sick time.  *Id.* ¶¶ 112, 147.  However, once it was determined that part of the accrued sick days were covered by worker's compensation, 42 days of sick time were restored to her accrued sick bank.  *Id.* ¶ 105.  When Bertuzzi stopped working in February 2018, the defendants also required her to use 93 of her accrued sick days.  *Id.* ¶ 111.  As that leave was not covered by workers' compensations, she was not reimbursed.  *Id.*  In any case, other than taking issue with the fact that she was required to use sick time, there is nothing in the record to suggest that other non-disabled teachers were treated differently with respect to their own use of sick time.  In fact, no comparison is made.

Moreover, Bertuzzi has failed to come forward with any evidence to suggest that she was assigned a disproportionate number of disciplinary or learning disabled students due to her disability.  Indeed, the record is clear that the assignment of classified children to language classes varied each year and was largely dependent on the number of students with special needs in any given year as well as the level of classes that needed to be offered.  While Bertuzzi takes issue with the complete accuracy of the LOTE rosters produced by the defendants, the fact remains that, even if the numbers are slightly off, those documents still reflect that the number of classified students in her classes was on the lower end of the spectrum.  *See* Defs.' Rule 56.1 Stmt. ¶¶ 32-9.  Also, the fact that Bertuzzi had an unusually large number of classified students in one of her classes in her final year of teaching is easily explained by the fact that she was the only teacher assigned to teach a Spanish I class that year.  *Id*. n. 3.  Indeed, that Spanish I class still had fewer classified students than the Spanish I classes taught in prior years by other

teachers.  *Id.* ¶¶ 37, 39.  Although Bertuzzi now argues that the defendants should have never assigned her a Spanish I class given her physicians recommendation that teaching "disruptive students with disciplinary issues and learning disabilities" could exacerbate her neck pain, the fact remains that there is no evidence that she was treated differently with respect to the assignment of a Level I class.  Accordingly, even construing the evidence in the light most favorable to Bertuzzi, the Court finds that her allegations of disparate treatment are insufficient to raise a triable issue of fact, and therefore, respectfully recommends that her claims of disparate treatment in violation of the ADA and the NYSHRL be dismissed.

For similar reasons the undersigned respectfully recommends that Bertuzzi's retaliation claims be dismissed.  "To present a *prima facie* case of retaliation, a plaintiff-employee [] must establish that (1) the employee was engaged in an activity protected by the ADA [or the NYSHRL], (2) the employer was aware of that activity, (3) an employment action adverse to the plaintiff occurred, and (4) there existed a causal connection between the protected activity and the adverse employment action." *Fox v. Costco Wholesale Corp.*, 239 F. Supp. 3d 564, 584 (E.D.N.Y. 2017), aff'd in part, vacated in part, remanded, 918 F.3d 65 (2d Cir. 2019).  Without even addressing whether sick leave accounting, room assignments, frequent observations or the number of classified students assigned to a teacher can even constitute adverse employment actions, the Court finds that Bertuzzi has not come forward with a shred of evidence that suggests a retaliatory relationship between her requests for accommodations for the 2015-16 through 2017-18 school years and any purported adverse employment action.  While "temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a *prima facie* case of retaliation," "without more, such temporal proximity is insufficient to satisfy [plaintiff's] burden to bring forward some evidence of pretext . . . in order to raise a triable issue

of fact." *Sivio v. Vill. Care Max,* 436 F. Supp. 3d 778, 802 (S.D.N.Y. 2020).  Accordingly, the undersigned further recommends that Bertuzzi's retaliation claims be dismissed.

### F.    Punitive Damages

Finally, the defendants contend that Bertuzzi has improperly asserted punitive damages against the District.  The undersigned agrees.  "It is well settled that a [school district] is immune from punitive damages." *Piotrowski on behalf of J.P. v. Rocky Point Union Free Sch. Dist.*, 462 F. Supp. 3d 270, 289 (E.D.N.Y. 2020) (citing *City of Newport v. Fact Concerts, Inc*., 453 U.S. 247, 248, 101 S. Ct. 2748, 69 L.Ed.2d 616 (1981)).  However, "[p]unitive damages may be awarded against individual defendants." *Id.* (citing *Jennings v. Town of Stratford*, 263 F. Supp. 3d 391, 414 (D. Conn. 2017) (listing examples where punitive damages were awarded against individual defendants such as school officials)).  Accordingly, the undersigned recommends that to the extent Bertuzzi is seeking to recover punitive damages against the District on her remaining failure to accommodate claim, she be barred from doing so.

## OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections.  Any requests for an extension of time for filing objections must be directed to Judge Seybert prior to the expiration of the fourteen (14) day period for filing objections.  Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140, 155, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); *Beverly v. Walker*, 118 F.3d 900, 901 (2d Cir. 1997); *Savoie v. Merchants Bank,* 84 F.3d

52, 60 (2d Cir. 1996).

Dated: Central Islip, New York
       January 30, 2023

                                    _____/s_____
                                    ARLENE R. LINDSAY
                                    United States Magistrate Judge